Mr. Schmunk knew two very important things, very powerful things that disqualify him and his partner, Mr. Sutton, from treatment for the entrustment defense. And those things were that Mr. LeGrand was selling his chain for a quarter to a third of his ostensible cost. And two, from that, he had concluded that Mr. LeGrand was getting ready to run, which means that he concluded LeGrand was going to pocket the money and not pay Cooper, which is exactly what happened. Those two facts, known or surmised by Schmunk, disqualify him and his partner from treatment for the entrustment defense, which allows a good faith buyer a defense against a claim for conversion. Here, could you speak up a little? I'm having some difficulty hearing you. Sure. I'll lean into the microphone a little bit. The entrustment defense allows a good faith purchaser a defense to a conversion claim, but he's got to be a good faith purchaser. And here, where Mr. Schmunk admitted that he knew those two items, that he knew that the price was suspicious, in his words, the prices were too low, and two, that LeGrand was getting ready to run meant that LeGrand wasn't going to pay Cooper, he's entirely disqualified from being treated as a good faith purchaser. When does the conversion occur in this case? The conversion occurs when LeGrand takes the goods and doesn't pay Cooper within a reasonable time period. How is the person, the third party, who's not party to the dealings between Cooper and LeGrand, supposed to know any of that? How do they know when? Generally, they wouldn't, but this fellow figured it out. Well, how did he figure it out? You didn't have a security interest in it. You didn't seem concerned. Your client didn't seem concerned about it. Your client was aware that the chains had been delivered. So how is the buyer in their position supposed to act as your representative to monitor the credit performance of LeGrand, who got legitimate title in the initial phase, right? In the initial phase, yes. So how does the buyer in their position, what burdens under the UCC are they required to perform to monitor the credit performance of your customer? When he pays a quarter to a third of the price that he figures his seller is obligated for, it's highly suspicious. So he's supposed to deduce from that that the guy he's dealing with is a crook. Not only is he supposed to, he did. He admitted it. Well, I guess my question is, I saw it a little differently about the conversion, or at least as to when you would measure the good faith. Wouldn't that be at the time the purchase was completed? I mean, you can't, for example, there's evidence that LeGrand was going to get the 100% profit because he wasn't going to pay. Didn't that occur after they purchased the chains? That warning occurred during the process. It was a serial purchase of chains. It was a number of different truckloads of chains. So there were still truckloads being purchased when that statement surfaced? When that statement was made, but the conclusion that LeGrand is getting to run, getting ready to run was reached very early on by Mr. Schmunk. I think before he received any chains. Are you just saying that all this raises a factual issue for the jury? I'm saying that there's no factual issue, but that he's disqualified from treatment as a good faith purchaser. When did title pass to the chains? Voidable title passed from Cooper to LeGrand when it was delivered. Well, title passed. How do you get to the fact that it's voidable? As I read the UCC 724102, title passes on delivery. That's correct, but it's voidable title. If he doesn't pay for it, if he steals it. Now, I've never heard of that. What makes it voidable? What section do you rely on to say it's a voidable title? I rely on the cases I cited on conversion that are to be read. But this isn't a conversion. This is a sale in which one party didn't pay. We have all kinds of situations like that where something is sold on credit and the person given credit doesn't pay, but that doesn't make the title voidable. It does if he doesn't pay and for no business reason, if the only reason here that he didn't pay was that he stole it. That he what? That he stole it. He didn't steal it. He entered into an agreement to purchase it and didn't pay. But that happens so often. That does happen a lot when there's some business pressure of some sort. So that's why you want a security interest. If you're selling and you're worried about that somebody is not going to pay, then you get a security interest in something that's sold. That would help. But I didn't. That's correct. When did Cooper learn? Didn't they learn that LeGrand wasn't going to pay back in March? They became concerned in March. What did they do to perfect or protect their interest as the one really in the driver's seat on this transaction? At that point, did they do anything? At that point, it's too late to get a security interest. What did they do? Did they go to the defendants in this case and say you should stop dealing with them or what? They didn't. They didn't do that. I think in large part because they didn't know the bargain basement price that this defendant was paying LeGrand. What difference would that make from their standpoint? The bargain basement price. How does that affect title passing? The bargain basement price means that this defendant saw an opportunity to take advantage of what he perceived were stolen goods. If he didn't make that judgment and he were truly a good faith purchaser, he wouldn't bear liability. He checked as to whether they were sold and as to whether a security interest had been retained. That doesn't mean stolen. I have an awfully hard time seeing how you convert something into being stolen. I don't see anything stolen. I think it was something that was purchased and the purchase price wasn't paid. There was not a dime of it paid and there was no reasonable explanation but that he engineered this entire deal to steal it. It was a one-time transaction. He rented a warehouse. Where in the UCC do you see the word steal in the transfer of title? The UCC is to be read in conjunction with the common law. It does not entirely supersede it in this instance. And the common law is that one whose goods are stolen can trace those goods into the hands of somebody. You're right if it's stolen. If, for example, a grand had gone out and emptied the warehouse and brought the chains over to his warehouse, that's stolen. But he bought them. But you shouldn't pay for them. He bought them under a subterfuge. But what was Cooper doing all this time? I think they were trying to figure out what happened to them. And so if they couldn't figure it out, how are these other guys supposed to figure it out? Because Cooper didn't know that this crucial fact that Mr. Schmunk knew, which was that Legrand was selling them for a quarter to a third of his purchase price, supposed purchase price. So what if it had been three quarters, 80 percent? I'm not trying to establish that at some point there a reasonable person should have said it was or was not stolen. I don't have to because Mr. Schmunk admitted it, that that was the conclusion he reached. What reference are you looking to in the record where he says these are stolen as opposed to looks like this other guy's not going to pay? That's two different things, isn't it? I think it's the same thing. Basically you have a defaulting purchaser in Mr. Legrand. You don't have a thief, right? Well... And when that happens, then the person who is wronged goes out and sues Mr. Legrand or takes some action. Normally, and it's not in the record, but Mr. Legrand was charged in this court with theft. So when he makes no effort to pay at all and tries to switch court within the district court here in Oregon... But he wasn't during the time... Presumably that would be a matter of public record so we could take judicial notice of that. Yes. During the time that these chains were being sold, was he charged with theft? No, that came much later. So that's not something we could impute knowledge about. Was he convicted? Actually pled guilty to a second charge of defrauding a dying priest. And the charges relating to Cooper were dismissed, but a $200,000 restitution order was entered on behalf of Cooper. But on a different ground, not theft. Yes, theft. Did Cooper do anything that's in the record to try to collect the money? From Legrand. From Legrand. Yes, I believe there was a meeting or a telephone conference call in late March with Legrand and the Cooper people. But I think it was pretty inconclusive, and that discouraged the Cooper people that they were going to be able to collect money from this fellow. So how many transactions and chains with the defendants here occurred after you say they made an unimpeachable conclusion that Legrand had no intent whatsoever to pay? I don't think they realized that he had no intent to pay until way later. No, I'm talking about the defendants. Are you saying the defendants had no idea? The defendants, no, I thought your question was addressed to Cooper. It was very early on, very, very early on. I think it was before any of the chain was delivered. It was after the defendants made the commitment to buy from Legrand and then went back and scratched their heads and said, gee, these prices are so good as to be suspicious. I think Legrand is getting ready to run, was the defense terminology. So that was before they took delivery of any chains? Yes. I thought somebody from Cooper came out to their warehouse and looked at the chains. That was during the process of accepting delivery. But at that point, Cooper didn't know. But when did that happen? Whose warehouse were those chains in? That was in the defendant's warehouse, and I believe that was in March or early April. And by then, at the time that the foot guy from Cooper says that Steve Coward came out? That was the second trip to the defendant's warehouse in late April. I think the last delivery was May 1st or thereabouts. Let me step back. Here's what I'm trying to understand. You're saying that even though Cooper had suspicions, you're relying on the defendant's suspicions and maybe better knowledge of Legrand to say that they should have known that he was not going to pay your client. Now, in the interactions between your client and the defendant's, give me the time frame in which they knew, that is, the defendant's knew, you say, that Legrand was going to not pay and they were dealing with Cooper, so that they should have said, hey, look, Cooper, this guy's going to run. Well, I'm not sure the defendant's had the obligation to say that. Constructively, in effect. Now they're being tagged with that. I think it's an evolutionary process to know you've been defrauded. And when Cooper came to that realization, I think it was sometime shortly after May, May 1st, when they had the meeting where they learned what the prices were. That was the first time they knew that these buyers were paying a quarter to a third of Legrand's obligation, which that fact is highly suspicious. And until they knew that, they could have suspected they weren't going to get paid, they were having trouble with collection, but they didn't realize it was a fraud on them. And the defendant's problem is that he investigated the fact of a security interest and thought he was home free when he realized there was no security interest. But that's not the law. You can't buy stolen goods as well. Right, if they're stolen. You know, the security interest thing seems to me to, in a way, be neutral. One inference is, hallelujah, there's no security interest, I'm home free. The other inference is, as a good business person, that's one of the things I ought to check, if there's any UCC filings, and you tell me there's not. So at least I don't have to worry about that issue if an issue comes up. So I'm not sure what we make of the UCC inquiry. You're damned if you do, damned if you don't. I think what I make of it is that the defense suspected there was a problem, that LeGrand wasn't going to pay, but the defense inquired of the status of the security interest, and when they found none, thought they were home free and could take advantage of LeGrand's theft. Would it be reasonable to assume they might have inferred, I don't know, but that if Cooper was concerned enough to take the security interest, then their suspicions of LeGrand maybe were just that, just suspicions? I don't think so, because I think security interests aren't as common as we may like to think they are in large commercial transactions. But if you don't get it, you can't trace the material that's sold or acquired. That's right, unless it's stolen, and unless the third-party buyer buys it. I don't think we've established it's stolen. Well, I beg to differ. You're saying that the exception is if it's not a good faith purchase? That's correct. All right, under the common law. I've got to reserve some of my time. You may. Well, thank you. May it please the court and counsel, I'm Dennis Purcell. I represent Schmunk and Quality Chain. I'm going to take the initial part of our brief to discuss. Mr. Larkin is going to deal with the arguments 3, 4, and 5. First, I want to address the facts in this case. You saw in our brief that one of our great concerns is that Plaintiff, in this case, has spun the facts, and I think the discussion you just had is an example of that. If you look through the stipulated facts, or excuse me, the concise statement of facts that was presented in the summary judgment proceeding, and those agreed to by Cooper at that time, you'll see that Cooper had sold and delivered all of the chain product to LeGrand, that by the time we first started buying in mid-April of 2000, Mr. Coward, the chief financial officer for Cooper at the time, had already come to the conclusion that he suspected they were never going to get paid by Mr. LeGrand, and in fact had hired an investigator, Mr. Heinous, to come out and start investigating what had happened to the chain. So Cooper was fully aware, before we ever bought one load of any chain, that Mr. LeGrand was a credit risk for them. They knew when they sold the product that they were selling it without a UCC. They knew that it was subject to sale to third parties before they ever even had an obligation from Mr. LeGrand for the first payment, because they sold it to him on time. They knew their product was at risk, and they didn't do anything about it. They knew they were at risk of getting paid for their product, and they didn't do anything about it until late March when they hired the investigator. They still didn't do anything about it when my client invited their local salesperson, Mr. Gillespie, out to the warehouse to look at the product and see that he was buying it, and they didn't do anything about it when my client, Mr. Schmunk, called Mr. Coward and said, Hey, I'm buying this stuff. Do you guys have any liens on it? So that's what the real history of the facts were. I want to correct one other timing of events, and that is the statement that has been made continually about my client saying he knew Mr. LeGrand was going to run. If you read the transcript as a whole, particularly ER-61 together with ER-57, you'll see that my client didn't come to any realization of that fact until after the purchases were made. In fact, my client says at ER-61, he says, Have you ever heard the expression, if it sounds too good to be true, it probably is. My client says, What I'm saying is you're not going to get me into the issue that I knew something was up because I didn't analyze it at that point, and that's the honest-to-goodness truth. So now one of the things that we need to look at in terms of sorting out the facts is if there is some dividing line between when things were purchased and what happened before and after that. In your view, when were the purchases completed? The last of the purchases was the 1st of May. Okay, May 1, and so the purchases ran during what period? April 14 to May 1. All right. Prior to that time, Cooper was fully aware of what was going on, and I think when you read the record as a whole of my client's testimony, well, in my client's testimony you'll see that he came to the conclusion after things were done that something seemed odd because he bought some parcels, he bought some parcels, and then he had one larger purchase toward the end, and it was after that that he made the purchases that I think ER-61 at pages 34 and 35 of my client's deposition show when it was that he discovered. I think the main point I want to make has already been made, and that is that this wasn't a conversion. This was a sale. Cooper knew exactly what they were getting into. They're a big company. They had financing arrangements in place with other customers, and they chose not to use them with Mr. LeGrand. They simply delivered the goods to him because they were dumping this material, and they wanted any warm body to buy them. They now want to use my client and Mr. Larkin's client as the method of payment, but it was a sale. It wasn't a conversion. It was a sale from Cooper to LeGrand, and it was a sale from LeGrand to our client. Cooper had plenty of opportunity to break that chain of events. It is an entrustment issue under 72-4030, and I think the question really does come down to whether or not our clients were ordinary buyers in the course of business in good faith, which is a subjective element. Is it an entrustment under that when it's a sale? As I read entrustment, it's when something is not necessarily sold, but just delivered, say, to a merchant for some purpose, to be held or to auction off or do something, but do we have an entrustment when there's an actual sale? I think entrustment would encompass that. So anytime that there's a sale and that there is some problem with payment or defrauding and so forth, then that entrustment provision applies to a subsequent purchaser, so they have to be in good faith and all that sort of thing? That's the plaintiff's argument. Well, I'm surprised it's your argument. It isn't necessarily. I'm addressing theirs. If you consider their argument in this context, then we get to that point of good faith buyer. Our position is that Mr. LeGrand was the owner and he had the right to sell them. The only obligation he had to Cooper was he was supposed to pay them, which doesn't become our obligation. I'm surprised that you're relying on entrustment and so forth. Well, I think that's what the issue in this appeal comes down to, based upon the plaintiff's argument. Well, yeah, the plaintiff's argument, but what you're making it to. I'm going to let Mr. Larkin make that. He and I have split things through the course of this, and he's the one who's preferred to deal with that. Okay. May it please the court, counsel? My name is Tom Larkin. I represent Sudman Johnson Defendants. I frankly agree with Your Honor. I don't think this is necessarily an entrustment issue. We addressed it at the district court level, and I think it's number four in our brief. We take also the position that this is just simply not a conversion case. Quite frankly, Cooper knew about the fact that they were delivering goods to LeGrand. They knew that Mr. LeGrand was a merchant dealing in those kinds of goods, and they expressly expected and actually knew about his plan to sell those goods on to third parties, which include my client and Mr. Purcell's clients. That is not conversion. Mr. LeGrand had the power and the authority to transfer those assets on to third parties. This is simply not a conversion case here. Okay, so if that's the case, then, and he was simply a defaulting creditor, and let's assume that your client knew that LeGrand was going to default. Your argument is that doesn't make any difference because good faith is not an issue. It's just flat out it's a sale, and you could have given them to you, and it would have been okay. Assuming those facts are in the record, which we don't think they are, that's true. I'm asking you to assume it so I know what your legal theory is. Okay, I'm confused because I had thought that the entrustment issue depended on the conversion aspect. And you're saying, no, if it's a sale, then we get into entrustment. We're saying that this case goes beyond entrustment. Entrustment applies where goods are delivered to a merchant who deals in those types of goods, and the person who transfers the assets doesn't necessarily know that there's going to be an intent to transfer those goods on to a third party, and particularly doesn't know about the actual sale on to third parties. In this case, we do have those facts. Cooper knew about the expectation that those goods would be delivered on. They gave possession of those goods to Mr. LeGrand with that expectation and understanding, and that's why we take the position that Mr. LeGrand had full power and authority to transfer those goods. I'm totally confused after reading all your briefs, then, because I thought you took the position that the general concept of buyer and good faith is applicable because it's a sale, and that in general UCC principles, good faith, ordinary course, is always applicable. It's just that you don't fall outside of it. Is that your position, or are you saying that ordinary course analysis doesn't even apply here? On the entrustment issue, we're saying, I think it's the way the case has been framed coming up to appeal, the district court decision was based upon the entrustment defense, and so that's why we focused on the entrustment defense. We don't think the plaintiff has the necessary elements for a conversion claim. Assuming he does have those necessary elements, we're relying upon the entrustment defense, and that is, Your Honor is correct, a person who in good faith buys in the ordinary course from a seller in the business of selling goods of that kind. So in other words, that really is applicable all the time. That's right. And so that's applicable here. Correct. Because basically Legrand is selling these goods, sells them to your clients. The question is, are they purchasers, ordinary purchasers in good faith, correct? Correct. They're in the entrustment defense. Okay. But do we analyze the, and so if there is a factual issue as to the good faith, then summary judgment would be inappropriate, correct? If there is a disputed issue of material fact, then summary judgment under the entrustment defense is not appropriate. Under the entrustment defense. And the question then is, if somebody is offloading goods at a low price and the defendants have some suspicions about whether circumstances are totally on the up and up, is that enough to raise a factual issue under the entrustment defense as to good faith? I am not aware of any case law that holds that a party that makes a good deal for goods, even though the person they're buying goods from may have paid a higher price for those goods, necessarily creates a factual issue about good faith, whether there's an existence of good faith or not. So if you're walking down the street and somebody has one of these fancy $1,500 racing bicycles and offers to sell it to you for a dollar, you don't think that might raise an issue as to whether that was stolen property or improper in terms of whether you should be buying it in good faith? I think it would raise a suspicion. There's a case actually cited by the appellant, the City of Portland v. Berry, and the basic fact pattern is where somebody comes into a bank, U.S. bank, delivers large denominations of bills, and the issue right at the end of the decision is whether there was good faith, whether the tellers accepted those large denominations in good faith. Admittedly, the tellers had suspicions about what was happening, the transaction. They inquired of the person actually giving them the property, and the court said there's nothing in the record that, because they made that inquiry, they received a believable explanation, there's nothing in the record that supports the finding of the lack of good faith. Was that a summary judgment case? I am not sure. Okay. Can you just, before I get too far adrift from where I want to come back to and just tie this down, you responded to Judge McEwen that the entrustment good faith analysis applies only if we were to conclude that there was a conversion, correct? Only if it's correct. Okay. Now, you said, therefore, if it's a sale, then the ordinary good faith buyer rules apply, correct? Correct. Okay. So is the good faith inquiry under entrustment the same as or different from the good faith inquiry under the buyer in ordinary courts? I think it's very similar. Okay. So there's no material difference. Right. So if there were a tribal issue under entrustment on good faith, it would still be a tribal issue, good faith in the ordinary courts. Right. In this case, we go beyond that. We make actual inquiry of Cooper, not only of LeGrand. What if there were a situation that, well, we'll put it in this category, that A sells goods to B, B takes delivery, B in turn, and it's on credit, B in turn sells to C, and C knows that B hasn't paid and may not ever pay. Can he not take title? Does he have to establish that he did good faith? I think he may be on a duty to inquire. And if he receives a believable answer and it actually takes the extra step of talking to the person who originally transferred the goods, he's satisfied that burden. Here we have admitted facts. Really, then, if you're a buyer, you have to check out to see whether or not the person that you're buying equipment from has been or is going to be paid for the goods. I have a hard time tracing that through the UCC. Are you saying, in this case, that your client discharged its duty as a buyer in the ordinary course because they inquired and they found out via Cooper that LeGrand had title? Right. And that's the end of their obligation? That's right. And the authority to sell. And the authority to sell. I think it goes beyond that even. So to get, then, to the next step that was, I think, at least two of us, if not three of us. Judge Hargass, so what if, in addition to the notion that he had the title but he wasn't going to pay, he was going to stiff Cooper? How does that play into the analysis under buyer in the ordinary course? Of course, I don't think we have that situation here. If you did. If we did. I think there would be an extra obligation to inquire of the original party, like Cooper, and to make sure that the transaction was on the up-and-up. But, of course, we don't have those facts here. The transaction was on the up-and-up. In other words, let's suppose. It's not as cheap as stolen goods. Yeah, I understand. But let's suppose that your client, knowing LeGrand, had taken it one step further. Instead of asking just whether they had a security interest, they'd said, and do you have any concerns that he's going to pay you for these goods? Is that what they were? Were they obliged to ask that question? I don't think so. I think anybody who sells on credit has some concerns. And if we imposed upon third parties the duty to inquire of that and satisfy themselves that an original party is going to be paid on credit, it just wouldn't work in the commercial world. One thing I'd like to do is. What if we said, yeah, I'm really worried about him. Since I sold it to him, I found that his credit really isn't very good. Does that put a different situation on what you've got? It's a very similar situation. They sold on credit. That's their risk. Well, that's what I'm wondering. It seems to me you're saying that, yeah, your client or the subsequent purchaser really has to check that out as to how good that person's credit really is. No, I may have misspoke. I don't intend to take that position. I think if there's a situation where there's clearly stolen goods, then there's a duty of inquiry. Now, we're beyond stolen. But with respect to credit risk, I don't think there's an inquiry. There's a duty on a third party to make sure that the original transfer of those goods is going to get paid on the credit. Perhaps. What? I didn't hear that. That the original party is going to be paid for those goods. Oh, you do have to ensure that. There is a duty or there is not a duty. There's not a duty. So the only duty arises when someone puts facts in your face that might give rise to an inquiry? That's right. The fact that somebody has received goods on credit and they may or may not have an obligation to pay on that credit, I don't think places a burden on a third party entering into a transaction for those goods. If LeGrand had said directly to one of your clients that, I make 100 percent profit when I don't have to pay for the goods, said that before this transaction then proceeded further, what's your client's obligation on that? Just assume that. I'm not saying that's what happened. But assume now as they move forward, they've got this low price. They're wondering how is he going to make a profit. But he says, hey, if you don't pay for them, it's all profit. Now, where are they in terms of duty to inquire, duty to do anything? Again, we don't have that. But I think they would have done exactly what they did do, or they should do what they exactly did, and that is to inquire of Cooper whether LeGrand had the power and authority to enter into a transaction selling the chain on to third parties. You do. You think that there is that obligation. That surprises me. I would like to. I think there's a fine line. When there are facts presented where it appears that the goods are stolen, I do think there is a duty to at least inquire. Yeah, but we don't have stolen. Exactly. And that's why I don't think there's that duty with these facts. But we're talking about credit. Right. The guy and Judge Fisher's question was that if we know that it's very unlikely that he's going to be paid and that he's pulling the fast one, do you have an obligation to do it? No. And you say yes. I say no. No. You say no now. No. You said yes earlier. And your final answer is? No. Do you want a lifeline? Pull the audience. One thing I would like to do is sharpen the pencil on some of the undisputed facts in this case because there have been various states thrown around. Well, sharpened pencil is a bad metaphor. Accountants do that and wind up getting indicted. Right. First of all, this closeout change shipped in about February of 2000. The payment was due within 30 days. Cooper knew that Legrand was a merchant dealing in the chain business. Cooper expected that Legrand would sell some or all of the chain onto third parties. And I just have two more facts if I may go beyond the time limit. You may. Thank you. Cooper placed no limits on Legrand regarding his disposal or resale of the chain. And as of March 23rd, 2000, Cooper representatives came to the realization that Legrand would not pay for the chain. Thank you. Thank you. Roberto? Roberto? Any errors by Cooper, any slowness in realizing that it was being defrauded, do not excuse the defendant's impure mind. When the defendant has reached the conclusion that these goods are likely stolen. Why do you keep saying they're stolen? If somebody, if I'm dealing with somebody, if I'm dealing with somebody, let's say Legrand has entered in, he's got an $800,000 line of credit or whatever from Cooper. And Legrand is otherwise a good guy, but it's clear that he's now in financial trouble. He's coming on hard times. And the defendants here know that this guy is on the verge of bankruptcy. Okay? So he's liquidating anything he can do to get his hands on some money to stave off other creditors. So they have a reasonable belief that Legrand is going to tank and your client isn't going to get paid. Are those goods stolen? Are the tire chains stolen at that point? It depends on Legrand's state of mind as to whether he has converted them or simply made a bad business decision. So how do they know in fact that his state of mind that he is absolutely not going to pay or there's just a lot of braggadocio or he's at risk of not paying? They know it. What's the evidence here that they absolutely know that he's absolutely not going to pay? They know two things. They reach the conclusion that he's getting ready to run, and two, they're warned by his confederate, Haggerty, that he anticipates 100% profit because he's not going to pay for it. Okay. Thank you. Thank you. The case of Cooper v. Sutton & Johnson is submitted. The last case for argument this morning is Nike v. Eugene McCarthy.
judges: Hug, McKeown, Fisher